

Brookfield Place
225 Liberty Street
New York, NY 10281

**Andrew B. Lachow**
Vice President and
Deputy General Counsel

andrew_lachow@timeinc.com
p 212-522-8307 f 212-467-0860

July 12, 2016

VIA ECF & FIRST-CLASS MAIL

The Honorable Thomas P. Griesa
United States District Court
 for the Southern District of New York
500 Pearl Street
New York, New York 10007-1312

    **Re:**  *Hardy, et al. v. Kaszycki & Sons, et al.*
       **No. 1:83-cv-06346 (S.D.N.Y.)**

Dear Judge Griesa,

  I write on behalf of non-parties Time Inc. ("Time") and the Reporters Committee for Freedom of the Press ("Reporters Committee"). Time is one of the world's leading media companies, with a monthly global print audience of over 120 million and worldwide digital properties that attract more than 150 million visitors each month, including over 60 websites. The Reporters Committee is an unincorporated nonprofit association of reporters and editors dedicated to safeguarding the First Amendment rights and freedom of information interests of the news media. Pursuant to Local Civil Rule 7.1(d), Time and the Reporters Committee respectfully request entry of an order directing the Clerk of the Court to unseal all sealed documents submitted to the Court in the above-referenced matter, *Hardy, et al. v. Kaszycki & Sons, et al.* (hereinafter "*Hardy*"), including ECF Nos. 409, 410, 411, and 412.

  By way of background, in 1979, the Trump Organization, Inc. ("Trump Organization") and the Equitable Life Assurance Company created a joint venture—called the Trump Equitable Fifth Avenue Company ("Trump-Equitable")—to demolish the Bonwit Teller building on Fifth Avenue in midtown Manhattan and construct the building now known as Trump Tower. *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 913 (2d Cir. 1989). To perform the demolition, Trump-Equitable hired William Kaszycki and his company, Kaszycki & Sons Contractors, Inc. (collectively, "Kaszycki"). *Id.* Originally captioned *Diduck v. Kaszycki & Sons Contractors, Inc.*, *Hardy* was a class action lawsuit alleging that Kaszycki employed undocumented Polish workers—sometimes referred to as the "Polish Brigade"—who performed much of the demolition work, and were paid "off-the-books."[1] *Id.* at 914–15; *Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F.Supp. 802, 805 (S.D.N.Y. 1991). The lawsuit stemmed from the alleged failure of Kaszycki and Trump-Equitable to make required contributions for the Polish workers' wages to a construction union's insurance trust funds and pension funds. *Diduck*, 874

---

[1] The *Hardy* matter has a lengthy procedural history. First filed in 1983, the case twice reached the U.S. Court of Appeals for the Second Circuit before being dismissed by this Court following a settlement in 1999. *See Hardy, et al. v. Kaszycki & Sons Contractors, Inc., et al.*, 870 F.Supp. 489, 492–93 (S.D.N.Y. 1994) (describing prior proceedings). In a separate action arising out of the same events, Kaszycki's employment of the Polish workers was found to have violated various provisions of the Fair Labor Standards Act. *Id.* at 492 (citing *Donovan v. Kaszycki & Sons Contractors, Inc.*, 599 F.Supp. 860 (S.D.N.Y. 1984)).

1

F.2d at 914–15. The now presumptive Republican presidential nominee, Donald J. Trump, as well as Trump-Equitable and the Trump Organization, were among the named defendants.

In 1999, this Court dismissed the *Hardy* case with prejudice following a settlement. *See* Order, *Hardy, et al v. Kaszycki & Sons, et al*, No. 1:83-cv-06346 (S.D.N.Y. entered Apr. 20, 1999), ECF No. 414. Based on our review of the docket in the *Hardy* matter, it appears that in the months leading up to the Court's dismissal of the case, at least four documents were filed with the Court under seal, and remain under seal to this day.[2] Three of those documents, ECF No. 409, 411, and 412, are described on the docket only as "SEALED DOCUMENT placed in vault (da)" along with their date of entry. One document, ECF No. 410, is described only as "(kb) (Entered: 11/09/1998)." Contemporaneous news reports indicate that one of the sealed documents filed with the Court is a written settlement agreement entered into by the parties (the "Settlement Agreement"). *See* Tom Robbins, *Deal Sealed in Trump Tower Suit*, N.Y. Daily News (Mar. 8, 1999), at https://perma.cc/3UZ5-FRVZ. Time and the Reporters Committee now respectfully requests that the Court unseal all sealed documents in the *Hardy* case, including the Settlement Agreement and any motions or related documents submitted to the Court.

## I.    The press and the public have a powerful interest in access to the sealed records.

The right of the press and the public to attend court proceedings and access judicial records is "firmly rooted in our nation's history"; it is premised on "the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*"). Indeed, as the Second Circuit has recognized, "professional and public monitoring [of the courts] is an essential feature of democratic control"; it "provides judges with critical views of their work and deters arbitrary behavior[,]" and promotes public confidence "in the conscientiousness, reasonableness, or honesty of judicial proceedings." *Id.*; *see also United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C. Cir. 1976) (explaining that access to court documents "is fundamental to a democratic state"), *rev'd on other grounds sub nom. Nixon v. Warner Commc'n*, 435 U.S. 589 (1978). While the benefits of public and press oversight of the judicial system are present in all criminal and civil cases, public access to judicial records and proceedings is all the more important when a government official or a candidate for public office is a party to the case. *See Smith v. United States Dist. Court for Southern Dist.*, 956 F.2d 647, 650 (7th Cir. 1992) (explaining that the right of access is particularly strong in cases where the government is a party because, "in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch").

Like other lawsuits involving the presumptive Republican presidential nominee, the *Hardy* case is a matter of substantial public interest and concern. Access to the sealed records in the *Hardy* case will provide the public with insight into Mr. Trump's frequent use of the court system and the opportunity to learn the outcome of specific civil litigation to which Mr. Trump was a party. *See, e.g.*, Nick Penzenstadler & Susan Page, *Exclusive: Trump's 3,500 lawsuits unprecedented for a presidential nominee*, USA Today (June 2, 2016), at https://perma.cc/925W-SYFM; Hannah Levintova, *Here's What*

---

[2] There may be additional sealed documents in this matter that are not reflected on the docket. For example, ECF No. 414, the last entry on the docket, is described as "ORDER, in accordance with the Court's 2/9/99 and 12/30/98 orders, all claims counterclaims and cross-claims between and among all of the parties are dismissed with prejudice." The referenced Court orders dated February 2, 1999 or December 30, 1998, however, do not appear on the docket. Accordingly, while Time and the Reporters Committee are able to point specifically to ECF Nos. 409, 410, 411, and 412, they respectfully request that to the extent there are additional sealed documents in the above-referenced matter, that those documents be made public as well.

*It's Like to Try to Sue Donald Trump*, Mother Jones (Mar. 28, 2016), at https://perma.cc/ZG2D-PLES; Brody Mullins & Jim Oberman, *Trump's Long Trail of Litigation*, The Wall Street Journal (Mar. 13, 2016), at http://on.wsj.com/2500gk8. Moreover, the public's interest in access to the sealed records here is particularly strong because the *Hardy* case speaks directly to issues that have been at the forefront of Mr. Trump's presidential campaign. Mr. Trump has made his opposition to illegal immigration, as well as his business acumen and judgment, including his ability to hire the right people, centerpieces of his presidential run. *See, e.g.,'This Week' Transcript: Donald Trump*, ABC News (Aug. 23, 2015), at http://abcn.ws/28JUtsQ; About Donald J. Trump, https://www.donaldjtrump.com/about/ (last visited June 14, 2016); Immigration Reform that Will Make America Great Again, https://www.donaldjtrump.com/positions/immigration-reform (last visited June 14, 2016); Compelling Mexico to Pay for the Wall, https://www.donaldjtrump.com/positions/pay-for-the-wall (last visited June 14, 2016); Shawn Tully and Roger Parloff, *Business the Trump Way*, Fortune (May 1, 2016), at http://for.tn/2446QVc; TIME Staff, *Here's Donald Trump's Presidential Announcement Speech*, TIME (June 16, 2015), at http://ti.me/1GLpmYD. The allegations made by the *Hardy* plaintiffs—that businesses hired by or affiliated with Mr. Trump failed to make required payments to certain union funds, and hired illegal immigrants to work on the demolition site for the Trump Tower project—as well as the resolution of their claims are, accordingly, of significant interest to the public.

In February of 2016, during a televised Republican presidential primary debate, then-presidential candidate Sen. Marco Rubio referred to the underlying facts of the *Hardy* case—the employment of workers from Poland for the Trump Tower project—in criticizing Mr. Trump. *See Transcript of the Republican Presidential Debate in Houston*, N.Y. Times (Feb. 25, 2016), at http://nyti.ms/1Lhjg6S. Sen. Rubio's reference, and the fact that a number of news organizations have already published stories comparing the facts of the *Hardy* case with Mr. Trump's current opposition to illegal immigration, further underscore the importance of press and public access to the sealed records at issue here. *See, e.g.*, Lisa Riordan Seville, Cynthia McFadden & Michelle Melnick, *Trump Tower Got Its Start With Undocumented Foreign Workers*, NBC News (Feb. 26, 2016), at https://perma.cc/HCZ5-CJL6; Gary Silverman, *US election: Trump's Polish worker problem*, Financial Times (Feb. 26, 2016), at http://on.ft.com/1n1K7IB; Michael Daily, *Trump Tower Was Built on Undocumented Polish Immigrants' Backs*, The Daily Beast (July 8, 2015), at https://perma.cc/37GG-KBBR

## II. The press and the public have a First Amendment and common law right to access the sealed records in the *Hardy* case, including the Settlement Agreement.

The Second Circuit has long recognized "two related but distinct presumptions in favor of public access to court proceedings and records: a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." *Newsday LLC v. County of Nassau*, 730 F.3d 156, 163 (2d Cir. 2013); *see also Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 & n.4 (2d Cir. 2006).

The First Amendment right of access "applies 'to civil trials and to their related proceedings and records,'" just as it does to criminal trials. *Newsday*, 730 F.3d at 163 (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2012)). The Second Circuit has "articulated two different approaches for determining" whether the First Amendment right of access applies to particular court records. *Lugosch*, 435 F.3d at 120. The first approach is the "experience and logic" test, which "requires the court to consider both whether the documents 'have historically been open to the press and general public' and whether 'public access plays a significant positive role in the functioning of the particular process in question.'" *Id.* (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004)); *see also Press-Enterprise Co. v. Superior Court,* 478 U.S. 1, 8 (1986) ("*Press-Enterprise II*"). Under the first prong of this test, "[t]he courts . . . have generally invoked the common law right of access to judicial documents in support of finding a history of openness." *Hartford Courant*, 380 F.3d at

3

92. The second approach "considers the extent to which the judicial documents are 'derived from or [are] a necessary corollary of the capacity to attend the relevant proceedings.'" *Lugosch*, 435 F.3d at 120 (quoting *Hartford Courant*, 380 F.3d at 93).

The common law presumption of access, on the other hand, attaches to all "judicial documents"—*i.e.*, documents that are "'relevant to the performance of the judicial function and useful in the judicial process.'" *Lugosch*, 435 F.3d at 119 (citing *United States v. Amodeo*, 44 F.3d 141, 145 (2d. Cir. 1995) ("*Amodeo I*")). "[T]he weight to be given the presumption of access" in a specific case is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Amodeo II*, 71 F.3d at 1049. "[A]fter determining the weight of the presumption of access, the court must 'balance competing considerations against it,'" such as, for example, the risk that public access will impair law enforcement or judicial efficiency. *Lugosch*, 435 F.3d at 120 (quoting *Amodeo II*, 71 F.3d at 1049).

Because "what transpires in the courtroom is public property," *Smith*, 956 F.2d at 650, the public "has an interest in what goes on at all stages of a judicial proceeding[,]" including settlement and dismissal. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999). The sealed documents at issue here, which were filed prior to the Court's dismissal of the *Hardy* case with prejudice, are judicial documents to which the public has a right of access under both the First Amendment and common law. *See In re September 11 Litigation*, 723 F.Supp.2d 526, 532-33 (S.D.N.Y. 2010) (holding that information contained in a motion to approve a settlement filed with the district court was presumptively public under the First Amendment and common law, explaining that the "categories of information sealed" were "central to the parties' settlement and [the court's] decision on their motion for approval").

As discussed above, although the docket's descriptions are vague, it appears that the sealed documents include the parties' final Settlement Agreement—which was presumably filed with the Court for judicial approval in accordance with Rule 23(e) of the Federal Rules of Civil Procedure—as well as the parties' motion for approval of that Settlement Agreement. *Hardy* was a class action lawsuit. *See Diduck*, 774 F.Supp. at 804. And, since at least 1966, the Federal Rules of Civil Procedure have required court approval for the dismissal or compromise of any class action. *See* Fed. R. Civ. Pro. 23(e), Notes of the Advisory Committee on Rules - 1966 Amendment. Judicial approval of a settlement agreement is unquestionably a judicial act, and any document submitted to a court as part of that approval process is a judicial document to which the presumption of access applies. *Xue Lian Lin v. Comprehensive Health Management, Inc.*, No. 08 Civ. 6519(PKC), 2009 WL 2223063 at *1 (July 23, 2009).

Indeed, when parties file documents with the Court for the purpose of securing judicial approval of a settlement the presumption of access is at its *strongest*, not only because the parties seek to invoke the court's Article III power, but also because "[t]he press and the public could hardly make an independent assessment of the facts underlying a judicial disposition, or assess judicial impartiality or bias, without knowing the essence of what the court has approved." *Geltzer v. Andersen Worldwide, S.C.*, No. 05 Civ. 3339 (GEL), 2007 WL 273526 at *2 (Jan. 30, 2007) (explaining that "the amount of the settlement is the critical factor in the Court's ability to assess whether the settlement should be approved"); *see also In re September 11 Litigation*, 723 F.Supp.2d at 532 (stating that a motion for approval invokes the court's Article III power and that the court's approval decision "is based on the information presented to [it]"). In short, any material submitted to the Court in support of a motion for approval of a settlement in the *Hardy* case, including the Settlement Agreement itself, "bears directly on [the Court's] adjudication of the settling parties' motion for approval," and any request to maintain such

material under seal "goes to the very core of the constitutionally embedded presumption of openness in judicial proceedings." *Id.* at 531 (quoting *Geltzer*, 2007 WL 273526 at *4).

Yet even if the parties' final Settlement Agreement were not approved by the Court, to the extent it was filed with the Court, it and any other documents filed in connection with securing a dismissal of the *Hardy* case with prejudice are judicial documents presumptively open to the public under both the First Amendment and common law. *See Gambale v. Deutsche Bank AG*, 377 F.3d 133, 143 & n.6 (2d Cir. 2004) (finding no presumption of access to the amount defendant agreed to pay plaintiff pursuant to the terms of a confidential settlement agreement that was not filed with the court, explaining that "[o]nce a settlement is filed in district court, it becomes a judicial record").

### III. No compelling interest overcomes the public's First Amendment and common law right to access the sealed records.

Because the sealed records at issue are judicial documents to which the First Amendment and common law presumptions of access apply, they can remain under seal only if the Court determines that the presumption of access is overcome by a compelling, countervailing interest. The Second Circuit has held that, under the First Amendment right of access, sealing must be supported by "specific, on the record findings . . . demonstrating that closure is essential to preserve higher values." *Lugosch*, 435 F.3d at 120. Broad, general, or conclusory findings are insufficient to justify closure. *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987). Similarly, under the common law right of access, sealing must "be supported by specific findings" that "the interests favoring non-access outweigh those favoring access." *Amodeo I*, 44 F.3d at 148. "Conclusory statements" will not suffice. *Xue Lian Lin*, 2009 WL 2223063 at *1. The burden is upon the parties opposing access "to demonstrate that the interests favoring non-access outweigh those favoring access." *Amodeo I*, 44 F.3d at 148.

Here, there is no indication from the public docket that the parties made any showing, whatsoever, in support of sealing ECF Nos. 409, 410, 411, and 412, or any other record. The public docket includes no entry for a motion to seal made by any party. Nor does it include any order of the Court sealing the parties' final Settlement Agreement, motion for approval of a settlement, or any other record; there is no indication that the sealing of any of the records at issue was supported by specific, on the record findings.[3] *See United States v. Haller*, 837 F.2d 84, 87 (2d Cir. 1988) (holding that the district court erred in failing to make any findings before sealing a plea agreement). A general interest in promoting the settlement of cases cannot, alone, justify sealing a settlement agreement, either in whole or in part, *In re September 11 Litigation*, 723 F.Supp. at 532, and that is especially true where, as here, the public has a particularly powerful interest in access. *See Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, No. 14-CV-6867 (VEC), 2016 WL 1071107 at *15 (S.D.N.Y. Jan. 12, 2015) (recognizing that although courts have a general interest in encouraging settlement, "this does not hold true at all costs"), *aff'd*, 814 F.3d 132 (2d Cir. 2016). Because the parties have not, and cannot, meet their

---

[3] We are unable to determine based on the docket's descriptions whether any of the sealed documents are a motion to seal and/or a sealing order. If so, such documents are subject to the presumption of access afforded by the First Amendment and common law, and should be unsealed. A motion to seal a filed document is itself a "judicial document," as it is relevant to the performance of a judicial function and seeks to invoke the court's Article III power to issue a sealing order. In addition, any court order sealing a document is also a judicial document. *See Ferrand v. Lyonnais*, 106 F.Supp.3d 452, 455 (S.D.N.Y. 2015) (holding that a court's decisions are judicial documents because they are "by definition 'relevant to the performance of the judicial function and useful in the judicial process'" (quoting *Lugosch*, 435 F.3d at 119)).

5

burden to establish that the presumption of access afforded by either the First Amendment or common law has been overcome, the sealed documents should be unsealed.

### IV. Any determination that the records should remain under seal, either in whole or in part, must be narrowly tailored.

Assuming, *arguendo*, that the parties could identify some compelling, overriding interest that would overcome the public's constitutional and common law rights of access with respect to some portion of the sealed records, any order sealing those records must be no broader than necessary to serve that interest, and the Court must consider alternatives to wholesale sealing. *Press-Enterprise Co. v. Superior Court of California* ("*Press-Enterprise I*"), 464 U.S. 501, 511, 513 (1984) (explaining that "[t]he trial judge should seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected"). The First Amendment requires that any sealing order be "narrowly tailored." *Lugosch*, 435 F.3d at 120. Thus, the sealing of a document to which the First Amendment right of access applies must not be "more extensive than necessary[.]" *In re New York Times*, 828 F.2d at 116; *see also United States v. Aref*, 533 F.3d 72, 82–83 (2d Cir. 2008) (stating that "it is the responsibility of the district court to ensure that sealing documents to which the public has a First Amendment right is no broader than necessary" and that courts must "avoid sealing judicial documents in their entirety unless necessary" (citing *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 13–14 (1986)). Similarly, under the common law, "[t]o the extent that compelling reasons exist to deny public access[,]" such limitations on access "should not be broader than necessary." *United States v. All Funds on Deposit at Wells Fargo Bank in Account No. 7986104185*, 643 F. Supp. 2d 577, 585 (S.D.N.Y. 2009). Courts should "edit and redact" judicial documents "in order to allow access to appropriate portions of the document[s]." *Amodeo I*, 44 F.3d at 147; *see also In re September 11 Litigation*, 723 F.Supp.2d at 533 (requiring parties to submit redacted versions of all papers submitted in connection with a motion for approval of a settlement where the court found that certain portions should be disclosed).

For all of the foregoing reasons, Time and the Reporters Committee respectfully request that the Court enter an order directing the Clerk of the Court to immediately unseal and make public all sealed documents in the above-captioned matter, including ECF Nos. 409, 410, 411, and 412. Thank you for your consideration of this request.

Respectfully submitted,

*/s/ Andrew Lachow*

Andrew Lachow
Vice President and Deputy General Counsel
Steven Weissman
Vice President and Deputy General Counsel
Time Inc.
225 Liberty Street
New York, NY 10281

Bruce D. Brown
Katie Townsend
Caitlin Vogus
The Reporters Committee for Freedom of the Press
1156 15th Street NW
Suite 1250
Washington, DC 20005

6