#443

CONFIDENTIAL/SUBJECT TO ORDER SEALING RECORD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
JOSEPH HARDY AND GUY HARDY,
etc., et. al.,

       Plaintiffs,

                                          NOTICE OF MOTION

                                      83 Civ. 6346 (KTD)

      -against-

KASZYCKI & SONS CONTRACTORS, INC.,
et. al.,

       Defendants.

----------------------------------------x

     PLEASE TAKE NOTICE that upon the Affidavit of Wendy E. Sloan executed November 9, 1998, appended hereto, and plaintiffs' memorandum of law submitted herewith dated November 9, 1998, and upon all of the papers and proceedings herein, plaintiffs will move this Court, pursuant to Rules 23 and 23.1 of the Federal Rules of Civil Procedure, and Rule 23.1 of the Local Rules of this Court, on December 10, 1998 at 10:00 a.m. or as soon thereafter as counsel can be heard, at the United States Courthouse, 500 Pearl Street, Courtroom 26B, for an order approving the settlement agreed to at the October 26, 1998 conference herein, as memorialized in the transcript thereof, submitted herewith, and approving the payment of plaintiffs' attorneys fees and costs in the amounts contemplated by the settlement, namely:   to the firms of Hall & Sloan ($687,500.00) and Steel, Bellman, Ritz and Clark,P.C.($187,500.00),

1

both of 351 Broadway, New York, N.Y., as more fully set forth in the Affidavit of Wendy E. Sloan appended hereto, and for such other and further relief as the Court may deem appropriate.

PLEASE TAKE FURTHER NOTICE that all papers in response or opposition to these motions, if any, are to be served upon plaintiffs' counsel, Hall & Sloan on or before November 24, 1998, and that plaintiffs will serve reply papers, if any, on or before December 8, 1998.

Dated:    New York, New York
          November 9, 1998

Wendy E. Sloan (WES 7996)
Attorney for Plaintiffs
351 Broadway, 4th Floor
New York, N.Y. 10013
(212) 431-9114

To:  Jay Goldberg, P.C.
     Suite 2020
     250 Park Avenue
     New York, N.Y. 10177

     Christopher Houlihan, Esq.
     Putney, Twombly, Hall & Hirson
     521 Fifth Avenue
     New York, N.Y. 10175

     Robert Wang, Esq.
     Mait, Wang & Simmons
     217 Broadway
     New York, N.Y. 10007

     Brendan Nolan, Esq.
     Lambert, Weiss & Pisano
     61 Broadway
     New York, N.Y. 10006

2

CONFIDENTIAL/SUBJECT TO ORDER SEALING RECORD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
JOSEPH HARDY AND GUY HARDY,
etc., et. al.,

        Plaintiffs,

                                    83 Civ. 6346 (KTD)

    -against-

KASZYCKI & SONS CONTRACTORS, INC.,      AFFIDAVIT IN SUPPORT
et. al.,                            OF SETTLEMENT AND
                                      FEES APPROVAL

        Defendants.

----------------------------------------x

State of New York  )

County of New York ) ss:

    WENDY E. SLOAN, Esq., being duly sworn, deposes and says:

    1.  I am counsel to the plaintiffs herein and have been since the inception of this litigation in 1983.  I am fully familiar with the facts and proceedings recounted herein.  I make this Affidavit in support of plaintiffs' application for the Court's approval of the settlement agreement made by the parties at the settlement conference conducted by the Court on October 26, 1998 and put on the record at that time.  A copy of the transcript is appended as Exhibit "A" and incorporated herein.

<u>Nature of the Case & Summary of the Settlement</u>

    2.  This fifteen-year-old action seeks to recover unpaid contributions alleged to be owed to the HouseWreckers Union Local 95 Pension & Welfare Funds for work performed by a group of undocumented Polish workers on the 1980 demolition of the Bonwit

Teller Building to make way for Trump Tower.  The damages provided for under the settlement will be paid into these Funds.

3.   Plaintiffs have essentially two claims:  (1) the First Cause of Action, brought derivatively on behalf of the Funds against the Trump Defendants as the de facto employers of the demolition workers, for Fund contributions owed under the Union's collective bargaining agreement; and (2) the Second Cause of Action, brought on behalf of the class of Fund participants and beneficiaries against former Union President/Fund Trustee Senyshyn for breach of fiduciary duty (and prohibited transactions) and against the Trump Defendants for their wrongful participation in those breaches, essentially accomplished through a conspiracy to defraud the Funds of contributions owed on behalf of the undocumented Polish workers.

4.   Defendant Fund Trustees are parties solely as nominal defendants to the First Cause of Action, which is brought derivatively on behalf of the Funds.  A detailed history of the litigation is set forth at paragraphs 10-20 below.

5.   The terms of the settlement agreement reached by the parties at the October 26 conference are memorialized in the transcript of those proceedings (Exhibit "A").  Under the agreement, the Trump Defendants will pay a total of $ 1,375,000.000 to settle all of plaintiffs' claims against all remaining defendants, that is, the Trump Defendants and Senyshyn,[1] including plaintiffs'

_____

[1]In 1989, plaintiffs obtained a default judgment against defendants William Kaszycki and Kaszycki & Sons Contractors, Inc.. Consequently, the Kaszycki Defendants are not included in the

2

claims for delinquent contributions to the Funds and plaintiffs' claims for attorneys' fees and costs of the action, which plaintiffs would divide to pay $500,000.00 to the Funds ($ 310,361.44 to the Pension Fund and $ 189,638.56 to the Insurance Trust Fund) and $875,000.00 in attorneys' fees and costs.

6.  This settlement provides for payment to the Funds of the full amount the Second Circuit held to be the most the Funds could recover on the Second Cause of Action, with interest through the end of 1998 (amounting to $463,437.19), and an additional, modest payment ($36,562.81). <u>See:</u> discussion, paragraphs 23-28 below. The settlement also provides for payment of plaintiffs' attorneys fees and costs of $875,000.  This figure is less than 50% of counsels' calculation of their actual fees and costs.  <u>See:</u> discussion, paragraphs 29-57 below.

7.  The representative plaintiffs have agreed to the settlement and ask the Court to approve it; <u>see:</u> paragraph 58 below.  In addition, at the October 26 settlement conference, counsel to nominal defendant Fund Trustees told the Court that he would recommend the settlement to the Trustees (tr. 11).

8.  As more fully set forth below, at paragraphs 59-63, and in plaintiffs memorandum of law, notice to the class/derivative members is unnecessary in this case because the full amount of damages goes to the Funds and no representative or individual member can receive any money in this case as a matter of law.

proposed settlement.  Subsequent discovery indicated that the judgment could not be collected against Kaszycki or his company, and Kaszycki has since died.

Consequently, the Court may waive notice.

9.    Finally, the settlement provides for confidentiality of the amount of payment; <u>see:</u> paragraphs 64-65 below.

<u>History of the Litigation</u>

10.    This case has resulted in the following reported decisions: <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 974 F.2d 270 (2d Cir. 1992) ("<u>Diduck II</u>"); <u>Diduck</u> v. <u>Kaszycki & Sons Contractors, Inc.</u>, 874 F.2d 912 (2d Cir. 1989)("<u>Diduck I</u>"); <u>Hardy v. Kaszycki & Sons Contractors, Inc.</u> 870 F.Supp. 489 (S.D.N.Y. 1994); <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 147 F.R.D. 60 (S.D.N.Y. 1993); <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 774 F.Supp. 802 (S.D.N.Y. 1991); <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u> 737 F.Supp. 792 (S.D.N.Y. 1990); <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u> 737 F.Supp. 808 (S.D.N.Y. 1990)

11.    The original complaint was filed in 1983 against the demolition contractor William Kaszycki and his company, Kaszycki & Sons Contractors, Inc., and former Local 95 President John Senyshyn (now deceased and represented by his wife, Stella Senyshyn, as representative of his estate) ("Senyshyn").    The complaint was amended in 1984 to add the Trump Defendants as parties (<u>i.e.</u> Donald J. Trump, Donald J. Trump d/b/a The Trump Organization, The Trump Organization, Inc., Trump-Equitable Fifth Avenue Company and the Equitable Life Assurance Society of the United States).

12.    Following denial of the Trump Defendants' preliminary motion to dismiss (treated as a motion for summary judgment), from 1986 through 1988 the parties conducted depositions and other

4

discovery (including documents requests and interrogatories) and, following litigation of two additional defense motions for summary judgment, the case was dismissed. On appeal, however, in 1989, the dismissal was reversed and the case remanded; <u>Diduck I.</u>

13.   On remand, during 1989-1990, the parties conducted additional depositions and other discovery and litigated numerous contested motions including, <u>inter alia</u>: (1) defendants' motions for summary judgment, <u>Diduck v. Kaszycki</u>, 737 F.Supp. 792; (2) defendants' motions to strike plaintiffs' jury trial demand, <u>Diduck v. Kaszycki</u>, 737 F.Supp. 808; plaintiffs' motions for rulings <u>in limine</u> admitting the U.S.Department of Labor's factual findings as to the man-hours worked on the job by the Polish workers, and barring parole evidence of the date the collective bargaining agreement was executed; and defendants' additional motion to dismiss. Thereafter, in 1990, the case went to trial before Judge Stewart.

14.   After a sixteen-day bench trial in 1990 and submission of post-trial briefs and supplemental materials, Judge Stewart awarded plaintiffs unpaid pension and insurance plan contributions with prejudgment interest, and attorneys' fees and costs in an amount to be determined at a later date. <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 774 F.Supp. 802 (S.D.N.Y. 1991). On appeal, Judge Stewart's decision was affirmed in part and reversed in part by the Second Circuit and remanded for further proceedings. <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 974 F.2d 270 (2d Cir. 1992).

15.   As to the Second Cause of Action, the Court of Appeals

remanded for further findings and, in addition, reduced the amount of contributions that plaintiffs could recover. Damages available on the Second Cause of Action were limited to the work performed by the undocumented Polish workers after Local 95 started work on the job on March 24, 1980. As to the First Cause of Action, brought against the Trump Defendants as _de facto_ employers, the Court of Appeals reversed Judge Stewart's grant of summary judgment for defendants and remanded that claim for trial.

16.    On remand, from 1992 to 1997, the parties conducted numerous depositions and other discovery and litigated numerous additional contested motions including, _inter alia_: (1) plaintiffs' motion to substitute Senyshyn's widow as representative of his estate following his death in 1992; (2) plaintiffs' motion to intervene to substitute new class and derivative representatives Joseph Hardy and Harvey Sherrod, upon the 1992 death of the original plaintiff, Harry Diduck; (3) the Trump Defendants' motions (_inter alia_) to dismiss and for summary judgment; (4) plaintiffs' 1997 motion to amend and to substitute a new representative (Guy Hardy) upon the death of Harvey Sherrod; (5) the Trump Defendants' 1996 motion for re-litigation of the entire Second Cause of Action on the basis of the Supreme Court's decision in _Lytle v. Household Mfg., Inc._, 494 U.S. 545, 110 S.Ct. 1331 (1990). In all, twenty-nine deposition sessions were conducted in the case from 1986 to present, eight by defendants and twenty-one by plaintiffs, and thousands of pages of documents were turned over by the various defendants to plaintiffs' counsel and analyzed.

17.    While defendants' summary judgment motions were pending in 1993, Judge Stewart passed away, and the case was re-assigned to Judge Duffy, who subsequently denied those motions; <u>Hardy v. Kaszycki</u>, 802 F.Supp. 489 (S.D.N.Y. 1994).    On the Trump Defendants' 1996 <u>Lytle</u> motion, however, Judge Duffy held that the entire Second Cause of Action must be re-tried to the jury, vacating Judge Stewart's factual findings in their entirety.

18.    During 1997-1998, in accordance with Judge Duffy's rules, the parties drafted a complex pre-trial Order including, <u>inter alia</u>, the citation, in support of each contention, of all previous trial and deposition testimony relied upon for support.  On May 11, 1998, the parties submitted with (and in addition to) the pre-trial Order, their memoranda and reply memoranda of law, jury instructions and proposed voir dire.  Plaintiffs submitted experts' affidavits/Rule 26 reports of three expert witnesses.  In addition, the Trump Defendants brought on a motion to preclude plaintiffs' expert witnesses and to bifurcate the trial as to liability and damages.    These motions were denied and defendants proceeded, during July of 1998, to depose plaintiffs' expert accountant as to interest calculations.

19.    In June of 1998, following the parties' filing of the pre-trial papers, Judge Duffy removed himself from the case and it was re-assigned to Chief Judge Griesa, who set it down to be tried in November 1998.  At a conference held September 9, 1998, the Court invited the parties to re-brief the legal issues that required resolution in advance of trial for his consideration, and

7

memoranda were submitted on October 16. As demonstrated in those memoranda, many highly complex substantive and evidentiary legal issues remain open and unresolved. In addition, virtually all factual issues are contested.

20. Also on October 16, the parties exchanged Rule 26 designations of prior testimony intended to be read at trial, including extensive portions of the 1990 trial transcript and depositions. The designations were necessitated, in part, by the deaths of witnesses including plaintiffs Harry Diduck and Harvey Sherrod, defendants John Senyshyn and William Kaszycki, and Trump's labor consultant, Daniel Sullivan.

<u>Settlement Terms</u>

21. Faced with a series of unresolved legal issues (as discussed above, and as set forth in the Trump Defendants' sixty-one page Trial Memorandum dated October 2, 1998 and in plaintiffs' letter-memoranda dated September 10 and October 16, 1998), and facing a long and complex trial, plaintiffs and the Trump Defendants entered into serious negotiations, which were discussed with the Court at a settlement conference on October 26, 1998. At the beginning of the conference, as the parties indicated, there was still a substantial gap between them. With the aid of the Court, however, the parties continued to negotiate, and resolved a settlement that was put on the record at that time (Exhibit "A").

22. Under the agreement, the Trump Defendants will pay a total of $ 1,375,000.000 to settle all of plaintiffs' claims against all remaining defendants, that is, the Trump Defendants and

Senyshyn, including plaintiffs' claims for delinquent contributions to the Funds and plaintiffs' claims for attorneys' fees and costs of the action, which plaintiffs would divide to pay $500,000.00 to the Funds ($ 310,361.44 to the Pension Fund and $ 189,638.56 to the Insurance Trust Fund) and $875,000.00 in attorneys' fees and costs.

The Funds' Recovery

23. Calculating the Funds' damages on the basis of the Court of Appeals' analysis in Diduck II as to the Second Cause of Action, that is, taking March 24 (the date Local 95 began work on the job) as the starting date for damages, damages with interest calculated at the Funds' rate of return on investments from 1980 through the end of 1998 is $463,437.19. As a result of the $500,000.00 allocated to the Funds, not only will the Funds be made whole under the Second Circuit's analysis, they will receive more than 100% of the loss which occurred because none of the defendants contributed to the Funds on behalf of the undocumented workers.

24. The $463,437.19 figure represents the following: (1) for the Insurance Fund: $ 43,164.85 base damages & $128,192.30 interest ($171,357.15 total); (2) for the Pension Fund: $53,956.55 base damages & $238,123.49 interest ($292,080.04 total). Dividing the additional $36,562.81 between the two funds, one receives an additional $18,281.40 and one an additional $18,281.41. Therefore, the Insurance Trust Fund will receive $189,638.56 and the Pension Fund will receive $310,361.44 under the settlement.

25. Plaintiffs believe that this settlement is fair and reasonable and in the best interests of the Funds and their

participants. This result is especially impressive given the age of the case, the likelihood that the litigation will otherwise continue unresolved for years to come, the many complex legal and evidentiary issues (many of which break new legal ground), the relative novelty of plaintiffs' claims, the uncertainty of obtaining the same or better result at trial, and the additional uncertainty of retaining that result on appeal in view of the multiple unprecedented legal issues and the Supreme Court's intervening decision in <u>Mertens v. Hewitt Associates</u>, 508 U.S. 248, 113 S.Ct. 2063 (1993), indicating in <u>dictum</u> that there may not be a cause of action under ERISA against third parties for wrongful participation in a fiduciary breach of duty (that is, the claim on which plaintiffs had prevailed at the 1990 trial). Moreover, this settlement is the result of vigorous, arms' length negotiation, as the Court no doubt observed during the settlement conference, and there is no question of collusion.

26. Although the Trump Defendants' potential liability on the First Cause of Action (about 4.7 million dollars) is higher than the settlement figure, this claim is seriously contested and was twice dismissed by the district court; <u>see, e.g.</u>: Judge VanGraafaland's dissent in <u>Diduck I</u> and Judge Newman's concurrence in <u>Diduck II</u>, which set forth some of the hurdles plaintiffs would face if the case were tried. These uncertainties weigh strongly in favor of settlement.

27. Moreover, this larger figure that may be recoverable on First Cause of Action is based upon calculation of damages from the

10

starting date of the job in January 1980 instead of from the date Local 95 started work on the job on March 24, 1980, which is also the date defendants say the union and the demolition contractor signed the collective bargaining agreement, in legal papers and arguments made to this Court. (At the September 9th conference, the Court granted the Trump Defendants' request to re-brief for its reconsideration whether evidence of the contract's signing date will be admissible at trial.) The issue of whether plaintiffs can collect damages for the period before the March 24th date is seriously disputed and would require the jury and the court to accept a new beginning date from the date adopted by the Second Circuit in <u>Diduck II</u> after the 1990 trial of the Second Cause of Action.

28. This larger figure also includes the calculation of <u>double</u> interest at the IRS penalty rates in accordance with the liquidated damages provision of Section 1132(g) of ERISA. Under the settlement, single interest compounded annually was calculated at the Funds' rate of return on their investments, a method that serves to make the Funds whole.

<u>Plaintiffs' Attorneys' Fees</u>

29. The settlement also resolves plaintiffs' claims against the defendants for attorneys' fees and costs. As to the Second Cause of Action, Judge Stewart awarded attorneys' fees and costs to plaintiffs pursuant to the discretionary fee-shifting provision of Section 1132(g)(1) of ERISA, with the amount to be determined at a later date; 774 F.Supp. 802 at 815. Fee-shifting to the defendants

is mandatory under the First Cause of Action under Section
1132(g)(2)(D) of ERISA.   In a "fee-shifting" case like this one,
fees are calculated by the "lodestar" method of multiplying the
number of hours reasonably expended on the litigation by a
reasonable hourly rate.   Hensley v. Eckerhart, 461 U.S. 424 (1983).

30.   The proposed payment of attorneys' fees and costs is
$875,000.00.   As counsel advised the Court at the settlement
conference, counsel  calculated their actual fees and costs as
being in excess of $1,600,000.00.   Upon re-calculation in the
course of preparing this application, counsel have determined their
actual fees and costs to be $2,092,888.00 ($1,834,713 for Hall &
Sloan and $258,175 for Steel, Bellman, Ritz & Clark).   Counsel have
agreed to accept a substantial reduction in their fees of over 50%
in order to make this settlement possible.   Under the settlement,
Hall & Sloan will receive $687,500.00 and Steel, Bellman, Ritz &
Clark, P.C. will receive $187,500.00.

31.   The fees calculated as actually owed to your deponent's
firm, Hall & Sloan, are approximately $1,804,275.00.   This figures
is based on counsel's calculation of fees for Sloan's work
constituting 4,558 hours expended on the case at $300 an hour and
1,165 hours for work performed by her deceased law partner, Burton
H. Hall, at $375 an hour).   Hall & Sloan's costs, in addition, are
approximately $30,438.00 (a figure that does not include costs
associated with the two appeals, as those financial records are
presently in storage).   The fees calculated as owed to Lewis
Steel's firm, Steel, Bellman, Ritz & Clark, are approximately

12

$254,000.00. This figure is based on counsel's calculation of fees for Mr. Steel's work constituting 626 hours expended on the case at $375 an hour and 55 hours for work performed by Mr. Steel's law partner, Miriam Clark, at $275 an hour, and for 28 hours of work performed by the firm's associate, Rachel S. Levitan, at $150 an hour. Steel, Bellman, Ritz & Clark's costs, in addition, are approximately $4,175.00. Counsel will incur additional time charges between now and the finalization of the settlement.

### HALL & SLOAN

32. Prior to Mr. Hall's death in 1991, Hall & Sloan was a two-attorney firm specializing in complex federal litigation in areas of labor law that concern the rights of employees and union members, primarily under the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. Sections 401 _et.seq._, the Labor-Management Relations Act of 1947 ("LMRA"), 29 U.S.C. Sections 151 _et. seq._, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. Sections 1000 _et. seq._, and the Civil Rights Acts of 1870 and 1964, 42 U.S.C. Sections 1981 and 1983, 2000 _et. seq._.

### BURTON H. HALL

33. Burton H. Hall was the pioneer litigator under the Labor Management Reporting and Disclosure Act, 29. U.S.C. Section 401 _et. seq._ (Landrum Griffin). He achieved, in his landmark 1963 case of _Salzhandler v. Caputo_, 316 F.2d 445 (2d Cir.), _cert. denied_, 375 U.S. 946 (1963), a holding that came to be followed as the national standard, the cornerstone of the laws' protection of union-member

13

rights, interpreting the scope of protection under Landrum-Griffin's guarantee of free speech rights to union members to include "slander". This is broader than the scope of the First Amendment in the private arena, where slander is subject to judicially-imposed sanctions through the civil courts. Because of Salzhandler, the Landrum-Griffin Act has had practical meaning for millions of American union members for some thirty years since, fulfilling the Congressional mandate of the promotion of internal union democracy.

34. Mr. Hall's thirty-three-year practice after Salzhandler is marked by a succession of decisions that continued to define the field, as well as other aspects of labor law; those of the Supreme Court and Second Circuit (some thirty of them) include, inter alia: Hall v. Cole, 412 U.S. 1 (1973) (establishing the availability of attorneys' fees under Landrum Griffin); Rosario v. Amalgamated Ladies' Garment Cutters, 749 F.2d 1000 (2d Cir. 1984) (broadly interpreting availability of LMRDA attorneys' fees); Santos v. District Council of New York City, 547 F.2d 197 (2d Cir. 1977) (establishing union members' standing to enforce labor contracts, such as union constitutions and collective bargaining agreements); Feltington v. Moving Picture Machine Operators, 605 F.2d 1251 (2d Cir. 1979) and Rosario v. Amalgamated Ladies' Garment Cutters, 605 F.2d 657 (2d Cir. 1979) (extending scope of procedural due process rights guaranteed by Landrum Griffin in union disciplinary trials); Petramale v. Local No. 17, 763 F.2d 13 (2d Cir.), cert. denied, 469 U.S. 1087 (1984) (broadening scope of LMRDA's free speech

14

protection); and including Mr. Hall's losses, <u>Harvey v. Calhoon</u>, 324 F.2d 486 (2d Cir. 1964), <u>reversed</u>, <u>Calhoon v. Harvey</u>, 379 U.S. 134 (1964) (Labor Department has exclusive jurisdiction; no private cause of action for pre-election challenges to union elections of officers); <u>Alfarone v. Bernie Wolfff 'Constr.Corp.</u>, 788 F.2d 76 (2d Cir.), <u>cert. denied</u> 479 U.S. 915 (1986) (a Fund participant can sue derivatively on behalf of the Fund to collect delinquent contributions only if he first establishes that the Fund trustees breached their fiduciary duty).

35.   Mr. Hall's work in labor law also included his representation of unions and their employee benefit plans; and it also included the litigation of countless hundreds of proceedings before such agencies as the NLRB, MSPB, EEOC and City and State human rights commissions, and through labor arbitrations.

36.   Mr. Hall graduated from Yale Law School (L.L.B. 1954), and received an LL.M. in 1958 from New York University School of Law (Graduate Division).   From 1960 until his death in 1991, Hall was engaged in the private practice of law in New York City, concentrating principally in the area of union members' rights. He practiced as a solo practitioner from 1960-1980.   In 1980 he helped to form the firm of Hall, Clifton & Schwartz and in 1984 the firm of Hall & Sloan in which he practiced until his death.

### WENDY E. SLOAN

37.   Your deponent ("Ms. Sloan") has served as lead counsel on the case since its inception in 1983.   Ms. Sloan practiced with Mr. Hall beginning in 1982, when she became an associate in the firm of

Hall, Clifton & Schwartz, and formed with him the firm of Hall & Sloan in July of 1984. Since Mr. Hall's death in 1991, Ms. Sloan has continued the practice as a solo practitioner. She is a member of the Bar of the States of New York, California, and New Mexico and various federal Bars, including the United States Supreme Court.

38. Ms. Sloan graduated from Hastings College of Law in 1974. From 1975-1978 she worked for the Agricultural Labor Relations Board of the State of California ("ALRB'), serving as Chief Staff Counsel to Board Member Ronald Ruiz and (before and after) as Counsel to the ALRB's General Counsel. Since 1982, she has specialized in federal litigation in areas of labor law that concern the rights of employees and union members, as an associate with Hall, Clifton & Schwartz (1982-1984), as Mr. Hall's partner in Hall & Sloan (July, 1984-1991) and as a solo practitioner (November, 1991-present).

39. In addition to decisions rendered in this case, Ms. Sloan's reported decisions include the following in which she served as lead counsel: Rodonich v. Senyshyn, 52 F.3d 28 (2d Cir. 1995) (LMRDA attorneys' fees); Rodonich v Housewreckers Local 95, LIUNA, 817 F.2d 967 (2d Cir. 1987) (LMRDA/union democracy); Rodonich v. Housewreckers Local 95, LIUNA 837 F.Supp. 550 (S.D.N.Y. 1993); Rodonich v. Housewreckers Local 95, LIUNA, 624 F.Supp. 678 (S.D.N.Y. 1985); Rodonich v. Housewreckers Local 95, LIUNA, 115 LRRM 2424 (S.D.N.Y. 1983); Rodonich v. Housewreckers Local 95, LIUNA, 115 LRRM 2482 (S.D.N.Y. 1983); Rodonich v. Housewreckers

Local 95, LIUNA, 115 LRRM 2491 (S.D.N.Y. 1983); Eatz v DME Unit, Local 3, 973 F.2d 64 (1992) (duty of fair representation/two tier wage system); Eatz v DME Unit, Local 3, 794 F.2d 29 (2d Cir. 1986); Kozera v. International Brotherhood of Electrical Workers, 892 F. Supp. 536 (S.D.N.Y. 1995) (duty of fair representation); Cruz v Robert Abbey, Inc., 778 F.Supp. 605 (E.D.N.Y. 1991) (WARN ACT plant closing/duty of fair representation); Cruz v. Robert Abbey, Inc., 136 LRRM 2648 (E.D.N.Y. 1990).

40. In addition to these cases, Ms. Sloan has served as lead counsel in multiple ERISA actions, Trustees of the Tapers Funds v. Bernie Wolff, et. al., 91 Civ 0634 (S.D.N.Y.) (and consolidated cases) (substantial monetary settlement, June 1996), in litigation under the Civil Rights Acts of 1870 and 1964, Lucas et. al. v. MCI Communications Corp., 83 Civ. 2737 (RO) and 85 Civ. 0918 (RO) (S.D.N.Y.) (substantial monetary settlement, January 1989), and in other federal labor cases. She has, in addition, represented unions including District Council 9 of the International Brotherhood of Painters and Allied Trades ("IBPAT"), Drywall Tapers Local 1974, IBPAT, and (with Hall) the Independent Association of Publishing Employees ("IAPE"), the in-house union at The Wall Street Journal. She has also served as Union-Trustee Counsel to the employee benefits funds of Painters District Council 9 and of Drywall Tapers Local 1974. She has represented employees, unions, and union Funds in numerous proceedings in such forums as the National Labor Relations Board, the New York City Commission and New York State Division on Human Rights, the Merit Systems

17

From:OUTTEN & GOLDEN LLP                                09/25/2017 17:31   #117 P.034/056

Protection Board, and in arbitration proceedings.

### STEEL, BELLMAN, RITZ & CLARK, P.C.

41.   In 1991, while this case was awaiting oral argument before the Second Circuit, Burton H. Hall died.  Following remand, your deponent, a sole practitioner, determined to bring in additional experienced counsel to assist her in carrying on the case and the firm of Steel, Bellman, Ritz & Clark agreed to join the litigation.

42.   Steel, Bellman, Ritz & Clark P.C. has specialized in federal litigation involving the rights of employees since its inception in 1982.  The firm has handled a wide variety of cases under Title VII of the 1964 Civil Rights Act and has represented clients with ERISA claims.  The firm has also litigated leading cases involving housing discrimination.  Lewis Steel, Miriam Clark (partners in the firm) and Rachel S. Levitan, their associate, have worked on this case.

### LEWIS M. STEEL

43.   Mr. Steel graduated from New York Law School in 1963, where he was the editor-in-chief of the Law Review.  In 1964, Mr. Steel became an assistant counsel and then associate counsel of the National Association for the Advancement of Colored People where he worked on a variety of civil rights cases throughout the United States.  His first complex employment discrimination case dates back to that period when he was counsel in Ethridge v. Rhodes, 268 F.Supp. 83 (D.C.Ohio 1968), which established the state's obliga-tion to ensure equal employment opportunities for minorities on

public construction projects.

44. After leaving the NAACP, Mr. Steel practiced law with a variety of firms including DiSuvero, Meyers, Oberman & Steel and Eisner, Levy, Steel and Bellman. In 1982, he and Richard F. Bellman formed the firm of Steel & Bellman, P.C., which is the predecessor of the present firm. His precedent-setting employment discrimination cases include Gillin v. Federal Paperboard Co., Inc., 479 F.2d 97 (2d Cir. 1973) (promotion discrimination); Rodriquez v. Board of Education of Eastchester Union Free School District, 620 F.2d 362 (2d Cir. 1980) (sexually discriminatory job assignments in a public school system); Grant v. Bethlehem Steel Corp. and Local 40, 622 F.2d 43 (2d Cir. 1980) (retaliation; formula for calculating back pay); Grant v. Bethlehem Steel Corp., 635 F.2d 1007 (2d Cir. 1980), cert. den., 451 U.S. 940 (1981) (discrimination in supervisory positions in the steelworkers' industry [class action]).

45. Mr. Steel was lead counsel in Avagliano v. Sumitomo Shoji (America), Inc., 453 U.S. 176 (1982) (establishing that Title VII law prevailed over an international treaty of friendship and commerce between Japan and the United States). A nationwide class was certified in that case, Avagliano v. Sumitomo Shoji (America), Inc., 103 F.R.D. 580 (S.D.N.Y. 1985) and Mr. Steel and Mr. Bellman achieved a broad-ranging consent decree which they monitored for three years.

46. With his partner, Miriam F. Clark, Mr. Steel played a leading role in achieving a broad ranging class action settlement

19

to protect the rights of African-Americans and female corrections officers in the case of <u>Holland v. New Jersey Department of Corrections</u>, C.A.No. 93-1683 (D.N.J.) (A.M.W.) in 1996.  In his capacity as class counsel, Mr. Steel has been monitoring the terms of this settlement and has been awarded attorneys' fees at the rate of $350 an hour for this work, a figure based on his prior rate at the time the case was settled.  Since 1996, he has raised his rate to $375 per hour, which is consistent with rates of attorneys of his experience.

47.  In the labor law field, Mr. Steel also joined Ms. Sloan in their successful litigation of the appeal in <u>Rodonich v. Senyshyn</u>, 52 F.3d 28, 34 (2d Cir. 1995) (availability of attorneys' fees to counsel in Landrum Griffin cases) and of-counsel to Ms. Sloan in <u>Trustees of the Tapers Funds v. Bernie Wolff, et. al.</u>, 91 Civ. 0634 (S.D.N.Y.).

48.  Mr. Steel also participated in <u>Huntington Branch NAACP v. Town of Huntington.</u>, 844 F.2d 926 (2d Cir.) <u>aff'd</u> 109 S.Ct. 276 (1988), which established the "effects test" in this circuit.  His criminal cases include <u>Carter v. Rafferty</u>, 621 F.Supp. 533 (D.Ct. N.J.1985), <u>aff'd</u> 826 F.2d 1299 (3d Cir. 1987), <u>cert. denied</u> 484 U.S. 1011, 108 S.Ct. 711 (1988) (murder convictions vacated for suppression of evidence and case later dismissed).

49.  Mr. Steel has lectured for the Practicing Law Institute on employment discrimination matters and has served as a member of the Board of Directors of the New York County Bar Association.  He is a member of the Bar of the States of New York and California and

various federal Bars, including the United States Supreme Court. In 1997, New York Law School awarded Mr. Steel an honorary Doctor of Laws Degree.

### MIRIAM F. CLARK

50.  Ms. Clark graduated from Harvard College with honors in 1980.  In 1984 she graduated from New York University School of Law, where she was a Root-Tilden-Snow scholar and colloquium editor of the <u>Review of Law and Social Change.</u> From 1984-1985 she served as law clerk for Hon. Max Rosenn, of the United States Court of Appeals for the Third Circuit.

51.  After her clerkship, Ms. Clark was an associate with the firm of Eisner & Levy, P.C., handling employment discrimination and labor law cases.  She then served as Assistant Attorney General in the Labor Bureau of the New York State Attorney General's Office.

52.  Ms. Clark has been a member of the firm of Steel, Bellman, Ritz & Clark, P.C. since 1992, having become an associate of the predecessor firm in 1987.  Since first becoming associated with the firm, she has specialized in employment discrimination work and has been heavily involved in the firm's class action employment discrimination cases, including monitoring and enforcing the decree in <u>Avagliano v. Sumitomo</u>, <u>supra</u>.  Ms. Clark also played a leading role in <u>Holland v. New Jersey</u>, <u>supra.</u>, and now leads her firm in monitoring and enforcing that settlement.  For her work in this regard the Court has awarded her fees at the rate of $250 an hour (based on her prior rate at the time the case was settled). Additionally, over the past eleven years, she has handled dozens of

21

employment and housing discrimination cases in federal and state courts, and before federal and state administrative agencies, as well as an ERISA matter in federal court. Her present rate is $275 per hour, which is consistent with the rates of attorneys of her experience.

53. Mr. Steel and Ms. Clark are also co-authors of <u>The Second Circuit's Employment Discrimination Cases:  An Uncertain Welcome</u>, 65 St. John's Law Review (1990), which was published in the Review's <u>Symposium Celebrating the Centennial of the Second Circuit Court of Appeals</u>. She will be lecturing on employment discrimination in the forthcoming New York Law Journal seminar on that subject. For the past several years she has served as cooperating attorney, supervising second and third year law students at the Fact Development Clinic at New York University School of Law, and as a mediator in the Southern District's mediation program. She is a member of the Bars of the Southern and Eastern District of New York and the United States Supreme Court.

### RACHEL S. LEVITAN

54. Ms. Levitan graduated from McGill University in 1991 and from the University of British Columbia Faculty of Law in 1995. She was admitted to the New York Bar in 1996 and the Federal District Courts for the Southern and Eastern Districts of New York in 1997. Ms. Levitan became an associate of Steel, Bellman, Ritz & Clark, P.C. in 1997 and has participated in a full range of that firm's cases. For an attorney of her experience, the rate of $150 is appropriate.

The Hourly Rates

55. Counsels' attorneys' fees were calculated at the following hourly rates: $375 an hour for Burton H. Hall and Lewis M. Steel (1954 and 1963 law school graduates respectively), $300 an hour for Wendy E. Sloan (a 1974 law school graduate), $275 an hour for Miriam F. Clark (a 1984 law school graduate), and $150 an hour for associate Rachel S. Levitan (a 1995 law school graduate).

56. These rates are in line with the accepted market rates in the New York metropolitan area for attorneys of small to medium size firms with comparable experience in federal employment litigation. The $300 rate for Ms. Sloan and $375 rate for Mr. Hall and Mr. Steel were used by counsel in calculating their attorneys' fees in making their attorneys' fee application to this court in the Rodonich case, supra., which was resolved by settlement in January 1997. And see: DeGaetano v. Smith Barney, Inc., 1998 U.S.Dist. LEXIS 10634 (S.D.N.Y.) (Ellis, Magistrate Judge) ($375 for senior counsel Judith Vladeck, a contemporary of Mr. Hall's and Mr. Steel's, $275 for partner Laura Schnell, a 1985 graduate and a contemporary of Miriam Clark, and $175 for associate); Nembard v. Memorial Sloan-Kettering Cancer Center, 918 F.Supp. 784 (S.D.N.Y. 1996) (Chin, J.) ($300 for counsel with more than 20 years in practice), citing Harris v. E.F.Hutton Group, Inc., 88 Civ. 0172 (AJP) (S.D.N.Y. Order Dec. 29 1993) (Magistrate Judge Roberts) (approving $400 rate for senior counsel Judith Vladeck, a contemporary of Mr. Hall's and Mr. Steel's, $300 for Anne C. Vladeck, who graduated in 1979 -- five years after Ms. Sloan, and

23

$275 for Laura S. Schnell, a 1985 graduate and contemporary of Miriam Clark), <u>Dailey v. Societe Generale</u>, 915 F.Supp. 1315 (S.D.N.Y. 1996) (Koeltl, J.) ($275 in Title VII case to Vladeck's partner, Laura Schnell, who graduated from law school in 1985, a contemporary of Ms. Clark; $175 to associates); <u>Jackson v. County of Nassau</u>, 1994 U.S.Dist. LEXIS 15336 (E.D.N.Y. October 18, 1994) (Spatt, J.) ($340 to $380 special master rates to senior counsel in Voting Rights Act case); <u>Schermerhorn v. Local 100</u>, 1996 WL 79334 (S.D.N.Y. Feb. 23, 1996) (LMRDA) ($300 an hour for Arthur J. Schwartz, a 1978 graduate who was Burton Hall's partner in Hall, Clifton & Schwartz [1980-1984], whose career is parallel to Ms. Sloan's).

<u>The Hours Expended</u>

57. In light of the protracted history of these proceedings recounted at paragraphs 10 through 20 above, the basis for counsels' fees provided for by the settlement is apparent. The case has been through three rounds of substantial discovery, extensive motion practice (including no less than six defense motions to dismiss or for summary judgment), a sixteen-day trial, two appeals, and extensive preparation for re-trial. It has required of plaintiffs' counsel, in addition, an extensive and burdensome investigation involving analysis of numerous government agency files and searching out, interviewing, continually re-locating and re-interviewing the Polish-speaking witnesses. It has resulted in two published Court of Appeals decisions that have established the law of the circuit on several important points

24

affecting the rights of participants in union employee benefit funds, and it has significantly expanded the protection of those rights. Such issues include establishing the fiduciary duty of Fund Trustees to investigate potential delinquency claims in <u>Diduck I</u>; establishing the right of Fund participants to maintain an ERISA action against third parties for wrongful participation in a trustee's breach of fiduciary duty in <u>Diduck II</u>; establishing the right of Fund participants to maintain an ERISA action against a non-party to the union collective bargaining agreement on the traditional labor law theory of joint employer liability in <u>Diduck I</u>, further developed in <u>Diduck II</u>; and expanding the scope of liability of non-parties who conspire to defraud ERISA Funds in <u>Diduck II</u>. Finally, the settlement contemplates a substantial monetary recovery for the demolition workers' pension and welfare Funds. Even if the settlement amount had not been substantial, however (which it certainly is in this case), in light of the legal significance of this case and its possible future benefit to other Fund participants counsel would be entitled to substantial fees in any event. <u>Grant v. Martinez</u>, 973 F.2d 96, 102 (2d Cir. 1992), <u>cert. denied sub nom. Bethlehem Steel Corp. v. Grant</u>, 506 U.S. 1053, 113 S.Ct. 978 (1993) (as to the beneficial importance of judicial holdings in Title VII action); <u>Rodonich v. Senyshyn</u>, 52 F.3d 28 (2d Cir. 1995) (LMRDA).

<u>The Representative Plaintiffs Have Agreed to the Settlement</u>

58. Your deponent has discussed the terms of the proposed settlement in detail -- including the specific amount of the

proposed payments to the Funds and to plaintiffs' counsel as attorneys' fees and the confidentiality agreement -- in separate conversations with each of the representative plaintiffs, Joseph Hardy and Guy Hardy. Each of them is in agreement with the settlement's terms and asks the Court to accept the settlement.

Notice to the Class/Derivative Members is Unnecessary and Should be Waived

59. Under the circumstances of this case, notice to the class and derivative members (i.e. the Fund participants and beneficiaries) is unnecessary and may be waived by the Court in the exercise of its discretion. See: Plaintiffs' Memorandum of Law, submitted in support of this application.

60. As to both causes of action, any recovery goes exclusively to the union's pension and welfare Funds. No plaintiff -- neither the representative plaintiff nor any class/derivative member -- can receive any monies. Therefore, in certifying the class, Judge Stewart held, 737 F.Supp. 792, 799:

> "Moreover, since the action satisfies Rule 23(b)(1)(B) and is not maintained under Rule 23(b)(3), we agree with plaintiff that the notice and "opt-out" requirements of Rule 23(c)(2) are inapplicable. (footnote omitted). Further, since any relief obtained will only accrue to the Funds, we believe that individual notice requirements to each class member are unnecessary."

61. Consequently, no notice of this case has been given to the class/derivative members at any previous stage in these proceedings.

62. Similarly, as to settlement under Rules 23(e) (regarding

26

class actions) and 23.1 (regarding derivative claims), while court approval is necessary in all cases, notice to the class/derivative members is not. The Court may approve a compromise without notice where -- as here -- no prejudice to the class/derivative members would result. See: Newberg On Class Actions, Third Edition, Section 8.18, at 8-59. If the court determines that dismissal or compromise of the action will not benefit the individual representatives to the detriment of the other members or otherwise prejudice those members, the court may dispense with notice.

63. Plainly, waiver of notice is appropriate under the particular and somewhat unusual circumstances of this case. The purpose of the notice requirement is to discourage the use of the class action or derivative devices by individual representative plaintiffs to obtain unjust private settlements, or "strike suits" in derivative cases, and to protect absent members against prejudice by discontinuance. These problems do not arise in this case, where any and all recovery of damages must go to the Funds alone, and the settlement contemplates an excellent recovery that is plainly in the best interests of the Funds. Moreover, no notice has been given to the members at any previous stage of the litigation.

Confidentiality

64. The Trump Defendants requested that the amount of the settlement remain confidential and the Court has directed that the record of the settlement proceedings be sealed. In light of the unusually high profile of defendant Donald Trump, plaintiffs have

27

agreed to confidentiality. However, the transcript of the settlement conference is somewhat ambiguous as to the scope of the confidentiality provision. Consequently, it is necessary to clarify those terms here.

65. The transcript records counsels' in-court agreement that disclosure of the settlement amount may be made to the plaintiffs. It is and was the understanding of plaintiffs' counsel that this includes both the representative plaintiffs and plaintiff class/derivative members. This is necessarily true. Although it is not necessary that members be given formal or published notice of the compromise, it plainly is necessary that the terms of the settlement (which will be binding upon all class/derivative members) be disclosed to a member in the event he or she inquires as to those terms.

WHEREFORE, plaintiffs ask that the Court approve the settlement agreement.

Wendy E. Sloan
(WES-7998)

Sworn to before me this
ninth day of November, 1998.

Notary Public

HARLENE KATZMAN
Notary Public, State of New York
No. 02KA5086390
Qualified in Kings County
Commission Expires Oct. 14, 1999

28

# EXHIBIT A

x8aqkhar                                   SEALED                                    1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -----------------------------x

3   JOSEPH HARDY, et al.,

4                   Plaintiffs,

5            v.                              83 Civ. 6346

6   WILLIAM KASZYCKI, et al.,

7                   Defendants.

8   -----------------------------x

9                                           New York, N.Y.
                                            October 26, 1998
10                                          4:15 p.m.

11  Before:

12                  HON. THOMAS P. GRIESA,

13                                      District Judge

14

15                  S E A L E D

16

17

18

19

20

21

22

23

24

25

x8aqkhar                                                                    2

SEALED

1

2                                    APPEARANCES

3     HALL & SLOAN
            Attorneys for plaintiffs
4     BY:   LEWIS STEEL
            WENDY SLOAN

5

6     LAMBERT WEISS & PISANO
            Attorneys for defendant Trustees
      BY:   BRENDAN W. NOLAN

7

8     MAIT WANG & SIMMONS
            Attorneys for defendant Estate of John Senyshyn
      BY:   ROBERT WANG

9

10    CHRISTOPHER HOOLIHAN
            Attorney for Trump defendants

11    JAY GOLDBERG
            Attorney for defendant Donald Trump

12    ALSO PRESENT:   Donald Trump

13

14

15

16

17

18

19

20

21

22

23

24

25

x8aqkhar                                                          3
SEALED

1          MR. GOLDBERG:  Your Honor, thank you for your

2   assistance.  I believe we have resolved this case under the

3   following terms and conditions:

4          There will be a payment by the defendants of the

5   sum of $1,375,000.  After your Honor approves of the

6   settlement, which will take place, I take it, on notice to

7   all sides, and for that, there will be an exchange of

8   general releases among and between the parties, there will

9   be a stipulation of discontinuance under, I think Rule 41.

10         It is further agreed that the terms and

11  conditions of the settlement will be sealed and that the

12  parties have agreed that they will not disclose, to anyone

13  other than their clients, the terms and conditions of the

14  settlement except to say that the litigation has been

15  resolved on terms agreeable to both sides.

16         MR. STEEL:  My name is Lewis M. Steel.  I am one

17  of the attorneys for the plaintiffs.  I have some comments

18  about that.  My "yes" was not a yes that everything you said

19  was the end of it.  I think it would be helpful, though,

20  because we do represent a class, to have appearances on the

21  record, so that it is clear that there is an attorney for

22  the funds here, and that Mr. Trump is here, etc., etc.

23         THE COURT:  The reporter will get from everybody

24  the appearances.

25         MR. NOLAN:  I asked Mr. Goldberg, was the

x8aqkhar                                                                    4

SEALED

1    stipulation of dismissal under Rule 41(b) with prejudice?

2              MR. GOLDBERG:  That is our understanding.  I left

3    out, Mr. Steel and your Honor, most respectfully, that there

4    will be an exchange of general releases between the

5    codefendants because I understand from Mr. Wang that there

6    is a crossclaim by Mr. Senyshyn against the Trump

7    defendants.

8              MR. STEEL:  If I may make a statement expanding a

9    little bit on what Mr. Goldberg has put on the record, we

10   have discussed how the $1,375,000 would be divided up, and

11   it is important that that be on the record.  It is

12   plaintiffs' proposal that $500,000 of that amount go to the

13   funds, the trust funds that are nominal defendants here, and

14   this is the derivative suit and a class action suit, in

15   effect, for their benefit.

16             I indicated to the court that pursuant to our

17   calculations, if we took the Second Circuit's last opinion

18   and used its March date for the beginning of damages and the

19   way it calculated damages up until that time, the $500,000

20   more than covers what the amount would be today.  Interest

21   is still running so the amount is higher than the Second

22   Circuit calculated at that time.

23             So that using the Second Circuit formula on the

24   second cause of action, the first cause of action having

25   never been tried, the funds would be getting, by our

x8aqkhar                                                          5
SEALED

1   calculations, more than 100 percent on the dollar.

2            We have indicated in off-the-record conversations

3   that our fees were in excess of $1,600,000, so that the

4   plaintiffs' counsel in this case actually would be taking a

5   significant cut in their fees in order to achieve this

6   settlement.

7            Obviously the figure is not the figure that

8   Mr. Goldberg and I settled.  We will have to discuss that

9   figure with our clients.  We are convinced that we should be

10  able to prevail on our clients to agree to that figure.  We

11  see no problem with that at all.  But obviously I do want to

12  put that on the record.

13           The other thing that we discussed, Mr. Goldberg

14  and I in the hall outside, was prompt payment from the Trump

15  defendants to plaintiffs, and if we could --

16           MR. GOLDBERG:  What is prompt payment?  What do

17  you have in mind?  The judge has to approve the settlement.

18           MR. STEEL:  That is right.  Within two weeks

19  after the settlement date, is that satisfactory?

20           MR. TRUMP:  Thirty days is normal.

21           MR. GOLDBERG:  Thirty days?

22           MR. STEEL:  Would that be satisfactory?  At that

23  point in time we would exchange the general releases, I take

24  it, when payment is made.

25           MR. GOLDBERG:  Sure.  I don't know the judge's

SOUTHERN DISTRICT REPORTERS (212) 805-0300

x8aqkhar                                                                6
SEALED

1    practice.  We could do this in court, and have a closing, in

2    effect.

3            MR. STEEL:  That would be fine.

4            The other thing which his Honor told us, which if

5    we do our application for approval on extremely short

6    papers, in light of the fact that everyone here approves of

7    this resolution --

8            MR. GOLDBERG:  I will accept short service.

9            THE COURT:  I think one of the things you must

10   have in there, though, is, the trust funds are agreeable to

11   the split as between the amount to be paid to the funds

12   versus the fees.

13           MR. STEEL:  Counsel is here --

14           THE COURT:  I would like it as part of your

15   application, and I do not want to get an answer -- this may

16   sound very squeamish.  I want you to be able to go back, as

17   you said you would, and discuss it with the funds.  That is

18   what you said in your statement.

19           MR. STEEL:  No, with the workers, the clients.

20   The funds in this case, just so the record is clear, are

21   nominal defendants because they refuse to --

22           THE COURT:  I don't want to complicate anything,

23   but whoever you said you were going to --

24           MR. STEEL:  Our clients.

25           THE COURT:  Your clients, and then in your papers

x8aqkhar

SEALED

1    tell me that they are agreeable to the settlement.  That is

2    really what I meant.

3              MR. STEEL:  Absolutely.

4              MR. NOLAN:  I will consult with the funds as well

5    and solicit their approval of this agreement as it has been

6    spread upon the record, once I am able to get the

7    transcript.

8              THE COURT:  Obviously we haven't gone through all

9    this without believing that everybody will consent, but I do

10   need that representation in your application.

11             MR. STEEL:  We certainly will with regard to our

12   clients, but, as I said, with regard to the clients they are

13   nominal defendants and have resisted this suit.

14             MR. WANG:  Your Honor, when Mr. Goldberg spoke,

15   he inadvertently talked about the payment coming from the

16   defendants.  I want to make it clear that the Trump

17   defendants are making the settlement and the estate

18   defendants are not paying anything.

19             The other thing I want to say, I am a little

20   perplexed that the damages Mr. Steel calculated, I know that

21   with respect to the session after trial, the damages

22   exclusive of interest were $59,000.

23             THE COURT:  Can I just say this.  This was a

24   statement that he made not to try to start an adversary

25   proceeding in this room about that, but that is his view,

x8aqkhar                                          8

SEALED

1   and we do not have to have the adversaries agreeing or

2   disagreeing.  But this is kind of, let's say, a forecast of

3   what he will put in his application to indicate that the

4   court should approve the settlement as fair and reasonable.

5   It is not a matter that needs to be disputed around the

6   table.

7          MR. WANG:  No, I don't mean to dispute it.

8          THE COURT:  I assume that the adversaries might

9   have very different views but it is not important to get

10  into that.

11         MR. WANG:  All it shows is that he has a better

12  deal than what he realizes.

13         MR. TRUMP:  I agree with you.

14         MR. GOLDBERG:  How is that helpful, Mr. Wang?

15         THE COURT:  I am sure there can be a lot of

16  discussion about views of litigation, but let us get the

17  settlement over with and see if people consent to it.  That

18  is the thing we must do, and then you can have your

19  discussions.

20         MR. WANG:  I just have one question about the

21  mechanics.  Are we going to get releases from the nominal

22  defendant?

23         THE COURT:  I am sure that anybody who wants

24  releases from any other party should get them.  There is no

25  point in not.

x8aqkhar                                                          9
SEALED

1              Is there anything else to put on the record?

2              MR. NOLAN:  On behalf of the trustees, I will

3    contact the trustees and request that they provide such

4    releases as are necessary to implement the foregoing

5    settlement.

6              I would just further add that of course the

7    settlement as spread upon the record involves no payment by

8    the trustees.

9              MR. GOLDBERG:  Judge, it has been agreed with

10   respect to the sealing of this record.

11             THE COURT:  You have agreed among yourselves

12   about how you will handle the information of the settlement.

13             MR. GOLDBERG:  Yes, sir.

14             THE COURT:  And I will say that the transcript of

15   this meeting, to the extent it has been put on the record,

16   and the tape, will be sealed and any papers filed seeking

17   approval and any order that I give granting approval that

18   contains any of this information will be put under seal, and

19   that that will be done.

20             We really ought to go around the room and let us

21   see if everyone is agreeable.

22             Counsel for the plaintiffs.

23             MR. STEEL:  Yes, your Honor.  I wanted to say one

24   thing.  It is our understanding that the payment gets made

25   to the plaintiffs, and then we pay the $500,000 over to the

x8aqkhar                                                    10

1   funds.  Procedurally, I think that is the way payment is

2   made.

3          MR. NOLAN:  At this point I don't have authority

4   to agree to that.  I don't want to hold up the settlement.

5          THE COURT:  That is the only way it can be.  That

6   is the only way it can be.  The funds are not suing.  What

7   you have to do is to make the payment to counsel -- there is

8   a way to do that.

9          MR. STEEL:  Yes.

10         MR. NOLAN:  We will work it out.

11         THE COURT:  Yes, of course you will.  As

12  recorded, the settlement is agreeable to let plaintiffs,

13  right?

14         MS. SLOAN:  Right.

15         THE COURT:  Counsel for Mr. Kaszycki?

16         MR. WANG:  There is nobody here for him.  I am

17  for the estate of John Senyshyn.  I represent the estate of

18  John Senyshyn.  My name is Robert Wang, of Mait Wang &

19  Simmons.  My firm represents the estate.  The settlement is

20  agreeable to us.

21         MR. HOOLIHAN:  Christopher Hoolihan for Trump

22  Equitable Fifth Avenue Company, Trump Organization Inc.,

23  Donald J. Trump d/b/a The Trump Organization, and the

24  Equitable Life Insurance Society of the United States.  We

25  agree.

SEALED

1           THE COURT:  Is it agreeable, Mr. Hoolihan?

2           MR. HOOLIHAN:  It is, your Honor.

3           MR. GOLDBERG:  It is agreeable, your Honor, to

4    Thomas A. Bolan, P.C., and Jay Goldberg, P.C., attorneys for

5    defendant Donald J. Trump individually.

6           THE COURT:  And Mr. Nolan.

7           MR. NOLAN:  Your Honor, I will recommend approval

8    of the settlement to the trustees of the House Wreckers

9    Union Local 95 Insurance Trust Fund and the trustees of the

10   house Wreckers Union Local 95 Pension Fund.

11          THE COURT:  I think that is all we need.

12          MR. WANG:  Judge, are the releases to be

13   exchanged simultaneously?

14          THE COURT:  You all know how to do that.

15          The motion to approve the settlement will be made

16   within two weeks, and give two weeks notice so that really

17   this whole thing can be concluded, as far as that phase can

18   be concluded.

19          Anything else?

20

21                                - - -

22

23

24

25